JUDGE SAND

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CATHERINE RUBERY, Derivatively On
Behalf of E*TRADE FINANCIAL
CORPORATION,

              Plaintiff,

vs.

MITCHELL H. CAPLAN, R. JARRETT
LILIEN, ROBERT J. SIMMONS, GEORGE
A. HAYTER, DARYL BREWSTER,
RONALD D. FISHER, MICHAEL K. PARKS,
C. CATHLEEN RAFFAELI, LEWIS E.
RANDALL, DONNA L. WEAVER and
STEPHEN H. WILLARD,

              Defendants,

    -and-

E*TRADE FINANCIAL CORPORATION, a
Delaware corporation,

              Nominal Defendant.

———————————————————— x

Case No. 07 CIV 8612

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, UNJUST
ENRICHMENT AND VIOLATIONS OF
§10(B) OF THE SECURITIES EXCHANGE
ACT OF 1934 AND RULE 10B-5
PROMULGATED THEREUNDER

DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of E*Trade Financial Corporation ("E*Trade" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between December 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to E*Trade and other damages, such as to its reputation and goodwill.

2.      Founded in 1991, E*Trade built its reputation as a provider of online brokerage services. The Company generated the bulk of its revenues from the commissions it earned in connection with these services. Beginning in 2003, however, E*Trade transitioned into mortgages, home-equity loans and other mortgage-related assets. In the years that followed, E*Trade's mortgage related revenues eventually overtook its online brokerage related revenues.

3.      During the Relevant Period, defendants directed E*Trade to improperly conceal that the value of the Company's mortgage related asset portfolio would be severely impacted by the subprime loan market crisis. Subprime loans are loans made to less credit worthy borrowers. Beginning in 2006, a downturn in the housing market triggered an increasing number of delinquencies among these borrowers. In turn, a number of subprime borrowers, the most poignant example being New Century Financial Corporation, either declared bankruptcy or exited the market. Due to defendants' improper reporting of E*Trade's business prospects, however, E*Trade's shareholders were blissfully unaware of any impact that the subprime market crash might have on the Company's bottom line.

4.      Thus, E*Trade's shareholders were shocked to learn on September 17, 2007 that the Company was exiting the mortgage business. The Company also announced that it was reducing its guidance for its fiscal 2007. In the wake of this disclosure and other disclosures concerning the

-1-

credit worthiness of E*Trade's mortgage related assets, the Company's value declined by over $9 per share—erasing over $3.8 billion in market capitalization.

5.      While E*Trade's shares were artificially inflated during the Relevant Period, defendants directed the Company to buyback over $118 million worth of its own shares at an average price of approximately $23 per share, which is substantially higher than E*Trade's current share price of $13.35. While E*Trade was repurchasing these shares, certain of the defendants sold nearly $5 million of their own shares at artificially inflated prices.

6.      Currently, E*Trade's credibility with investors is in shambles. Even worse, on October 2, 2007, an E*Trade shareholder filed a class action lawsuit against the Company alleging securities laws violations.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.      This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice. Several of the defendants are citizens of New York.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) E*Trade maintains its principal place of business in the District; (ii) one or more of the defendants either

- 2 -

resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to E*Trade occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.     Plaintiff Catherine Rubery is and was, at times relevant hereto, an owner and holder of E*Trade common stock. Plaintiff is a citizen of South Carolina.

12.     Nominal defendant E*Trade is a Delaware corporation with its principal executive offices located at 135 East 57th Street, New York, New York. E*Trade is a financial services corporation.

13.     Defendant Mitchell H. Caplan ("Caplan") is E*Trade's Chief Executive Officer and a director and has been since January 2003. Because of his positions, defendant Caplan knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Caplan received the following compensation:

| Defendant | Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| Caplan | 2006 | $750,000 | $1,724,928 | $2,612,943 | $4,700,000 | $157,635 |

Defendant Caplan sold 114,347 of his personally held shares for $2,708,634.68 in proceeds. Defendant Caplan is a citizen of Maryland.

14.     Defendant R. Jarrett Lilien ("Lilien") is E*Trade's President and Chief Operating Officer and has been since 2003. Lilien is also an E*Trade director and has been since November 2006. Because of his positions, defendant Lilien knew, consciously disregarded, was reckless and

grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committes thereof, as well as reports and other information provided to him in connection therewith. Defendant Lilien received the following compensation:

| Defendant | Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|-----------|-------------|--------|--------------|---------------|----------------------------------------|------------------------|
| Lilien | 2006 | $650,000 | $1,278,560 | $1,944,868 | $3,800,000 | $93,509 |

Defendant Lilien sold 33,805 of his personally held shares for $779,232.65 in proceeds. Defendant Lilien is a citizen of New York.

15.    Defendant Robert J. Simmons ("Simmons") is E*Trade's Chief Financial Officer and has been since January 2004. Simmons was E*Trade's Corporate Treasurer from 2001 to 2004. Because of his positions, defendant Simmons knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Defendant Simmons received the following compensation:

| Defendant | Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|-----------|-------------|--------|--------------|---------------|----------------------------------------|------------------------|
| Simmons | 2006 | $500,000 | $374,143 | $609,917 | $1,620,000 | $53,545 |

Defendant Simmons sold 57,115 of his personally held shares for $1,306,140.47 in proceeds. Defendant Simmons is a citizen of New York.

16.    Defendant George A. Hayter ("Hayter") is E*Trade's Chairman of the Board and has been since 2003. Hayter is also an E*Trade director and has been since December 1995. Because of his positions, defendant Hayter knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of

-4-

E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Hayter is citizen of England.

17.     Defendant Daryl Brewster ("Brewster") is an E*Trade director and has been since October 2004. Brewster is also a member of E*Trade's Audit Committee and has been since January 2006 and a member of the Compensation Committee and has been since February 2005. Because of his positions, defendant Brewster knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Brewster is a citizen of New Jersey.

18.     Defendant Ronald D. Fisher ("Fisher") is an E*Trade director and has been since October 2000. Fisher is also a member of E*Trade's Compensation Committee and has been since February 2005. Because of his positions, defendant Fisher knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Fisher is a citizen of Massachusetts.

19.     Defendant Michael K. Parks ("Parks") is an E*Trade director and has been since April 2003. Parks is also Chairman of E*Trade's Audit Committee and a member of the Compensation Committee and has been since at least 2005. Because of his positions, defendant Parks knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets

-5-

and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Parks is a citizen of California.

20.     Defendant C. Cathleen Raffaeli ("Raffaeli") is an E*Trade director and has been since April 2003. Raffaeli is also Chairman of E*Trade's Compensation Committee and has been since at least 2005. Because of her positions, defendant Raffaeli knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith. Defendant Raffaeli is a citizen of New York.

21.     Defendant Lewis E. Randall ("Randall") is an E*Trade director and has been since 1982. Randall is also a member of E*Trade's Audit Committee and has been since at least 2005. Because of his positions, defendant Randall knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Randall is a citizen of Washington.

22.     Defendant Donna L. Weaver ("Weaver") is an E*Trade director and has been since April 2003. Weaver is also a member of E*Trade's Audit Committee and has been since at least 2005. Because of her positions, defendant Weaver knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers

and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith. Defendant Weaver is a citizen of Washington.

23.    Defendant Stephen H. Willard ("Willard") is E*Trade's Vice-Chairman of the Board and has been since December 2006. Willard is also an E*Trade director and has been since April 2005. Willard is a member of E*Trade's Audit Committee and has been since at least 2005 and a member of the Compensation Committee and has been since January 2006. Because of his positions, defendant Willard knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse non-public information about the business of E*Trade including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Willard is citizen of France.

24.    The defendants identified in ¶¶13-14, 16-23 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-15 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-15 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

25.    By reason of their positions as officers, directors and/or fiduciaries of E*Trade and because of their ability to control the business and corporate affairs of E*Trade, the Individual Defendants owed E*Trade and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage E*Trade in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of E*Trade and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.    Each director and officer of the Company owes to E*Trade and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

-7-

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of E*Trade, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with E*Trade, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of E*Trade.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of E*Trade, and was at all times acting within the course and scope of such agency.

29.     To discharge their duties, the officers and directors of E*Trade were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of E*Trade were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the Securities and Exchange Commission ("SEC") and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

-8-

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how E*Trade conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

30.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of E*Trade, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of E*Trade's Board during the Relevant Period.

31.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of a class action lawsuit that alleges

-9-

violations of securities laws.  As a result, E*Trade has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

32.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

33.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at E*Trade and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) facilitate the Insider Selling Defendants' sale of nearly $5 million of their personally held shares; and (iv) deceive the investing public, including shareholders of E*Trade, regarding the Individual Defendants' management of E*Trade's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

34.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true fact that E*Trade was misrepresenting its business prospects.

35.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment and

violations of the Exchange Act and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

36.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

38.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to E*Trade a duty to insure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

39.     This material, non-public information principally included E*Trade's liquidity problems and other issues stemming from the collapse of the mortgage lending market. Furthermore, defendants Brewster, Parks, Randall, Weaver and Willard, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that that the committee is responsible for reviewing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

40.     Defendants Caplan, Lilien and Simmons, as officers of E*Trade, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Caplan, Lilien, Brewster,

Fisher, Hayter, Parks, Raffaeli, Randall, Weaver and Willard, as directors of E*Trade, had ample

opportunity to discuss this material information with management and fellow directors at any of the

Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the

Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally

caused or allowed, by their actions or inactions, the following improper statements to be

disseminated by E*Trade to the investing public and the Company's shareholders during the Relevant

Period.

    41.    On December 14, 2006, E*Trade, under the Individual Defendants' direction, held a

conference call to discuss the Company's fiscal 2007 earnings guidance. During the call, defendant

Caplan touted E*Trade's supposed growth prospects. In particular, defendant Caplan stated the

following:

> We have long said that we define ourselves as a growth Company based on
> our ability to generate annual revenue growth of 10% to 15%, earnings growth of
> 15% to 20%, with an operating margin approaching 50%. From our current
> inflection point, the Company is positioned to not only meet, but exceed those growth
> targets in 2007. Based off the current 2006 consensus revenue and GAAP EPS
> estimate, the annual guidance we establish today reflects revenue growth of 14% to
> 24% from the low to high end of the range, GAAP EPS growth of 15% to 26%, with
> an annual operating margin of 47%. Most importantly, we expect to deliver these
> strong results even as we make additional investments in marketing and service.
>
>        * * *
>
> We expect to generate these results as a function of three core growth
> initiatives in 2007. The first is building on the success that we achieved year-to-date,
> we will continue to drive growth in target segment accounts. We will achieve this
> through a continued investment to attract and retain these target segment accounts
> while migrating Main Street into this segment, all through our investment
> relationship managers and marketing. Second, we will deliver continued
> improvement and profitability throughout the model as the result of greater
> integration, scale, and efficiencies, including the full-year benefit of Harrisdirect and
> Brown, as well as moving clearing under the bank. And third, we will generate
> accelerated growth through success in our Corporate Services and international
> operations, two avenues for growth that are unique to our model. In addition to these
> initiatives, but not embedded in our guidance, is the continued opportunity to
> supercharge growth, scale, and efficiency through accretive acquisitions in any of the
> core areas of our business. This includes opportunities both domestically, as well as
> internationally, and across transactions, cash and credit originations, or asset
> aggregation.

    42.    On January 18, 2007, the Individual Defendants caused or allowed E*Trade to issue a

press release announcing its fiscal fourth quarter 2006 financial results. The press release contained

a statement by defendant Caplan that E*Trade was ideally positioned to capitalize on secular growth

trends in the Company's industry. Specifically, the press release stated in part as follows:

> "In 2006 the Company delivered a fourth consecutive year of record results while successfully integrating two key acquisitions and strategically investing in product, service and marketing to strengthen the future performance of the franchise.... As a result of this success, we enter 2007 *ideally positioned to capitalize* on the secular growth trends of the industry, and we will continue to seek out targeted investments to build stronger client relationships and drive broader product engagement in the US and abroad."

43.     On April 18, 2007, the Individual Defendants caused or allowed E*Trade to issue a

press release announcing its fiscal first quarter 2007 financial results. The press release contained a

statement by defendant Caplan attributing E*Trade's continuing success to continuing growth in the

Company's target segments. The press release also disclosed that E*Trade was lowering is fiscal

2007 earnings estimate due to a "retail customer behavior and engagement levels." Specifically, the

press release stated in part as follows:

> "We are extremely pleased with the response to our marketing and service investments this past quarter which generated record net new accounts, with continued strong growth in our target segments, and record levels of customer assets and cash....   The success we are seeing in attracting and retaining high-value customers is clearly beneficial to the long-term growth of the franchise."

*   *   *

> "Although the *broad based markets have been strong*, the recent volatility in the macroeconomic environment has affected retail customer behavior and engagement levels. As a result, we are reducing our 2007 earnings estimate to better reflect the muted retail environment we are now experiencing as compared to our expectations at the end of 2006," ....

44.     On April 18, 2007, E*Trade, under the Individual Defendants' direction, held a

conference call to discuss the Company's mortgage loan portfolio. During the call, defendant Caplan

insisted that any risk imposed by the growing subprime market crisis was mitigated by E*Trade's

mix of assets. In particular, defendant Caplan stated the following:

> With much having been reported about rising delinquencies and default rates among subprime asset portfolios, we also recognize that we are operating in a changing credit environment. Given our historic and continued strict discipline with respect to credit, we believe that the risk to our balance sheet *is significantly mitigated* compared to financial institutions with a more traditional mix of assets.   We recognize that we are not immune to the current environment, and we are anticipating

-13-

upward trends in delinquencies and charge-offs in our portfolio versus last year levels and even versus assumptions when we gave guidance in December.

To set some context, in 2006, we booked $45 million in provision for loan losses. Embedded in our guidance for 2007 last December, we forecasted an increase in our provisions of 51% to $68 million or to approximately $17 million per quarter, based both on the growth and the seasoning of our portfolio. In the first quarter, we reported $21 million of provision, an extra $4 million or $0.005 per share against earnings. We believe that this is the result of what is happening in the broader credit environment. If you annualize these trends, it translates into an additional $0.02 per share provision expense for 2007 over and above what was embedded in our original guidance. Exercising prudence and for guidance purposes, we are assuming provision expense of $96 million for the year or quarterly provision expenses of approximately $25 million for the balance of the year. This translates into $0.04 a share per headwind to our original earnings guidance for the year. This number represents a 2% reduction to the mid point of our original guidance and is relatively contained, given the benefit of the credit quality of our portfolio.

Look across our $37 billion loan portfolio, over $26 billion is in one to four-family mortgages and home equity products, $7 billion is margin debt from our investing customers, and the remainder is legacy consumer loans that are in run-off mode. Across the entire mortgage portfolio, our dollar weighted average FICO score remains at a solid 735. The average loan-to-value ratio is 73% and the average debt-to-income ratio is 35%, all numbers consistent with this time last year. In our one to four-family first lien portfolio, the average FICO is 738, LTV's averaged 68%, and DTI averages 34%. As we continue to grow our mortgage portfolio throughout this year, growth will tend to be more heavily weighted, 70% in one to four-family first lien products meeting that criteria. In second lien product, the average FICO is 732, LTV's averaged 79%, with an average DTI of 36%. Specifically *with respect to subprime loans*, based on the standard industry definition of borrowers with FICO scores of 620 or below, we hold approximately $50 million of balances, or less than one-fifth of 1% of our $29 billion whole loan portfolio, *a de minimis amount.*

45.    During the call, an analyst questioned defendant Caplan about an increase in E*Trade's provision for loan losses. In response, defendant Caplan again insisted that E*Trade's loan portfolio would not be significantly effected by the growing subprime market crisis. In particular, defendant Caplan stated the following:

[MITCHELL CAPLAN:] Happy to do it. So as I said, last year we had charge-offs as you saw of about $45 billion. We assumed, as I said in the prepared remarks -- what? $45 million, sorry. $45 million. Yes, good point. [LAUGHTER] And this quarter, as we were really building the guidance for this here, don't forget we have had pretty consistent growth in the balance sheet. So under any circumstances, notwithstanding the fact that we have stayed completely disciplined about *focusing on what we call prime* and really super-prime borrowers, you're going to see an increase in charge-offs just as a result of the increasing balance sheet size. We also assumed that, as the balance sheet, which is growing – has been growing continues to season, you would see an uptick. So, as we were modeling for this year last year and then gave guidance

-14-

in December, we had always assumed that it would go up to the $68 million or about $17 million a quarter. So in our model we had always presumed that that was going to be the case having nothing to do with a more difficult credit environment in any meaningful way, but simply as a result of both size of the balance sheet and seasoning of the balance sheet.

The incremental difference this quarter that we saw of the $17 million that we have expected to about $21 million we believe is the result of what's happening in the overall credit market, which is this discussion about what's happening in subprime, what's happening in Alt-A, and to the extent it that, more importantly, any of that is bleeding up into the general prime and super-prime market. Our view I guess going forward is -- and we were trying to be prudent about this -- is that as you looked forward for the rest of this year, we could simply have said, all right, we saw a $4 million unexpected increase. If you annualize that, it would have been somewhere in the neighborhood of $16 million or $0.02.

But we believe, given what we're seeing and what we're trying to prepare for, is the *worst case scenario* absent an absolute mortgage meltdown that you'd see a lost severity trend in the small percentage of our portfolio that we discussed, literally increasing by 50%. That that's what would drive the increase of the $28 million.

You know, it may not come out to bear, but I guess in our mind, given everything we're seeing, we're better off being prudent around discussing this, and then putting context around the size of the overall balance sheet and then making it being clear for the first time ever that when you look at what the market is concerned about in either subprime or all day, one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%. So I feel pretty good when I recognize that *over 99%* of our whole loan portfolio is, fact in, in those products which have traditionally *not been impacted* in markets like this.

46.    On July 25, 2007, the Individual Defendants caused or allowed E*Trade to issue a press release announcing its fiscal second quarter 2007 financial results. The press release disclosed that E*Trade was once again reducing its earnings guidance. Specifically, the press release provided in part as follows:

> The Company also narrowed its 2007 pro-forma earnings guidance to a range of $1.58 - $1.72 per share from the previous range of $1.55 - $1.75, leaving the mid-point of $1.65 unchanged. This pro-forma range excludes the $0.05 per share of expense for certain legal and regulatory matters realized during the second quarter. Including these expenses, the Company now expects to earn $1.53 - $1.67 per share on a GAAP basis in 2007.

> "Our second quarter results demonstrate the strategic and economic success we have achieved through investments in product, service and marketing over the past several years.... We delivered record performance in the quarter while improving the overall quality of revenue and earnings through continued growth and engagement led by our high-value, target segment accounts."

47.    On July 25, 2007, E\*Trade, under the Individual Defendants' direction, held a conference call to discuss the credit quality of the Company's mortgage loan portfolio. During the call, defendants again insisted that the effect of the subprime market crash on the value of the Company's mortgage portfolio would be *de minimus*. In particular, defendants Caplan, Simmons and Lilien stated the following:

> HOWARD CHEN: Okay. Finally, Mitch, just switching gears, we're now a few quarters into the launch of the loan optimizer. It seems like your margin loan balances are tracking higher. From what you can see, is at all of function of your customers shifting their leverage away from HELOCs or credit cards to margin loans or is that simply just a function of overall equity market appreciation? Put another way, are you happy with the way that the loan optimizing is progressing?

> MITCHELL CAPLAN: Yes, but again it is early days and so we would hope to continue to see -- has the loan optimizer been as successful as the cash optimizer? No. But again, it is early days and we expected it to take longer. When you think about the growth that we experienced in margin in this past quarter and, again, I think what we have seen so far in Q3, we think that most of that is driven, whether it is the loan optimizer or otherwise, by continued engagement within the target segment.

> JARRETT LILIEN: The thing is, the loan optimizer is a good awareness tool right now and it is doing its part, but just reiterating what Mitch said, the real growth is additional accounts. It is the growth in the target segment that is driving -- drives 76% of our revenues. It grew 29% in the quarter. That is what is driving assets, cash, DARTs, and margin.

> HOWARD CHEN: Okay, thanks, Jerrett. Thanks, Mitch.

> ROBERT SIMMONS: Let me clarify one other point that was made earlier by Mitch. It was a question around the vintages and stuff. I think if you look at our total book as of the end of this quarter, you can see that the growth in our loan book came exclusively in one to fours and margin, which are our highest quality loan categories. If you look at our consumer and our HELOC book, they were both down. So the question with respect to vintages, we do not have zero in '06 vintages in our book. We will give you some more details when we file our Q. But just wanted to clarify that the reduction of $400 million related to our HELOC book this quarter and we would expect that sort of trend to continue.

> MITCHELL CAPLAN: Right, and I guess I was responding to was what Matt [Drury], who was sitting next to me, was talking about, which is within the '06 vintage, we have *zero in subprime.* So I think that was the issue that I was responding to and I guess the sheet of paper that I have been seeing. So again, our subprime quarter-over-quarter continued to stay flat and declined a bit. Then what could be thought of as subprime, I guess, in the '06 vintage is zero at this point.

48.    On August 16, 2007, E*Trade issued a press release concerning the supposed credit quality of its mortgage and securities portfolios. The press release stated as follows in relevant part:

> Management maintains that it does not believe that the current market capitalization accurately reflects the financial strength and performance of the business.
>
> Selected highlights from the presentation include:
>
> - The Company's $15.7 billion first lien mortgage portfolio is supported by *high FICO scores*, low Loan-to-Value ratios (LTV) and private mortgage insurance
>
> - All first lien mortgage loans with an 80% or higher LTV are protected by private mortgage insurance
>
> - $9.2 billion, or 74%, of its home equity portfolio is to borrowers with *FICO scores of 700 and higher*
>
> - $12.6 billion, or 99%, of mortgage-backed securities are rated AAA
>
> - 97% of its Asset-backed Securities portfolio is rated investment grade
>
> - Consistent and growing base of retail customer cash
>
> - $10 billion in excess wholesale borrowing capacity from the Federal Home Loan Bank

49.    On August 16, 2007, *TheStreet.com* ran an article titled E*Trade Bounces Back. The article reported that rating agency Egan-Jones had downgraded E*Trade's debt to B+ from BB-, citing a probable need to mark down the value of E*Trade's mortgage an loans receivable portfolio. The article also quoted an E*Trade spokeswoman who responded as follows:

> We continue to reiterate that while the volatility of the mortgage industry does impact us, *the financial health of the company is sound*. We believe the fear reflected in the current market capitalization is *unfounded* and are working diligently with investors to reassure them of the franchises' strength.

**THE TRUTH IS REVEALED: E*TRADE IS EXITING THE MORTGAGE MARKET**

50.    On September 17, 2007, E*Trade announced that it was exiting the wholesale mortgage market and that it was downward revising its earnings guidance for a third time. Specifically, E*Trade disclosed the following:

> The Company is *exiting or restructuring non-core businesses* that lack a direct and strategic connection with its retail customers. The Company is also accelerating

-17-

plans to shift the composition of its balance sheet toward retail assets and liabilities and to synchronize balance sheet growth with customer engagement. In addition, the Company is *increasing the provision for loan losses* due to charge-offs expected as a result of the *disturbance in the credit markets*. As a result of these actions, E\*TRADE FINANCIAL is revising 2007 earnings guidance to account for higher provision for loan losses, potential securities impairments, reduced balance sheet growth and restructuring charges. Despite these factors, the Company confirms that its balance sheet funding sources remain sound and the Company remains well capitalized based on regulatory standards.

\* \* \*

The specific details of the plan, and expected financial implications (all figures are pre-tax, with the exception of EPS and net income), include:

- Balance sheet growth and composition strategy. For the foreseeable future, balance sheet growth, if any, will be driven by the continued growth in cash and deposit balances from retail investing and trading customers. Through at least 2008, *interest-earning assets will remain relatively flat* with third quarter levels, with growth in customer cash and deposits used to replace wholesale fundings. The Company plans to reduce balances in home equity, consumer loans and securities, replacing these assets as they pay down or mature with margin debt and prime first lien mortgages from retail customers. The planned run-off in home equity loans, consumer loans and securities will reduce both the overall level of risk within the portfolio and expected future loss levels. Through this initiative, the composition of the balance sheet will shift significantly toward retail assets and liabilities, reducing wholesale contributions to revenue and net income. The Company anticipates making this transition in an orderly fashion over the next 18-24 months. Given the expectations for limited balance sheet growth going forward, the capital needs of the overall business will be reduced - creating opportunities in higher return investments such as accelerated share and debt repurchase activity or other initiatives to strengthen the business.

- Increased allowance for loan losses. Given the significant deterioration in the mortgage market in August and particularly the pace of change in the performance of home equity loans in August, the Company expects *charge-offs of $95 million dollars* and total provision expense of $245 million in the second half of 2007. The majority of this provision is expected to be recorded in the third quarter. With this additional reserve, allowance for loan losses as a percentage of non-performing loans is expected to increase to 75 percent based on assumptions for the second half of the year, up from 45 percent on June 30, 2007. Within home equity loans, where the Company and the marketplace have seen the most significant stress, the coverage will be approximately 100 percent, up from 51 percent as of June 30, 2007.

- Potential for securities impairments. Embedded in the Company's modified guidance is an assumed *securities impairment of up to $100 million* in the second half of 2007. The expected impairments in the guidance are predominantly related to deterioration in the performance of asset-backed securities comprised of second lien loans and CDOs (collateralized debt obligations).

- Exiting and restructuring non-core businesses. The Company will exit its wholesale mortgage operations and will streamline its direct mortgage lending business to focus on its retail franchise. In addition, the Company will restructure its institutional sales trading business in a manner to better align it with retail activity. Total severance, restructuring and other exit charges are estimated to be *approximately $32 million*, the majority of which will occur in the fourth quarter.

As a result of the actions outlined above, the Company is revising its earnings outlook for 2007 to account for 1) higher provision for loan losses; 2) potential securities impairments; 3) slower balance sheet growth and composition expectations; and 4) exit and other restructuring charges. For the full year 2007, E*TRADE FINANCIAL expects GAAP net income of between $450 million and $500 million, and earnings per share of between $1.05 and $1.15 per share. This is down from its previous range of $1.53 to $1.67.

## REASONS THE STATEMENTS WERE IMPROPER

51.     E*Trade's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)     E*Trade was experiencing an increasing number of delinquencies in its mortgage and home equity portfolios;

(b)     E*Trade failed to timely record an impairment charge on its mortgage and home equity portfolios;

(c)     E*Trade's securities portfolio was materially overvalued; and

(d)     Based upon the foregoing, E*Trade's earnings guidance for fiscal 2007 was grossly inaccurate.

## DAMAGES TO E*TRADE CAUSED BY THE INDIVIDUAL DEFENDANTS

52.     As a result of the Individual Defendants' improprieties, E*Trade disseminated improper statements concerning its business prospects as alleged above. These improper statements

have devastated E*Trade's credibility as reflected by the Company's $3.8 billion market capitalization loss. Additionally, E*Trade is now the subject of a shareholder class action lawsuit alleging securities laws violations. The Company will face substantial costs in connection with this lawsuit.

53.    Moreover, while E*Trade's shares were artificially inflated, the Individual Defendants directed the Company to waste assets through the buyback of over $118 million worth of its own shares at an average price of $23 per share.

54.    Further, as a direct and proximate result of the Individual Defendants' actions, E*Trade has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred in investigating and defending E*Trade and certain officers in the class action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment; and

(b)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to E*Trade.

55.    Moreover, these actions have irreparably damaged E*Trade's corporate image and goodwill. For at least the foreseeable future, E*Trade will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that E*Trade's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## THE IMPROPER BUYBACK

56.    During the Relevant Period, while E*Trade's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of 5,133,625 shares for over $118 million worth of its own shares at an average price of approximately $23 per share, which is substantially higher than E*Trade's current share price of $13.35. While E*Trade was buying back these shares, the Insider Selling Defendants made the sales described below.

## INSIDER SELLING

57.    While in possession of the undisclosed material adverse information, the Insider

Selling Defendants sold the following shares of E*Trade stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| CAPLAN | 2/15/2007 | 6,370 | $24.10 | $153,517.00 |
| | 2/15/2007 | 3,030 | $24.10 | $73,023.00 |
| | 2/26/2007 | 72,211 | $24.08 | $1,738,840.88 |
| | 5/3/2007 | 9,851 | $22.75 | $224,110.25 |
| | 5/3/2007 | 7,983 | $22.75 | $181,613.25 |
| | 5/25/2007 | 14,902 | $22.65 | $337,530.30 |
| | | 114,347 | | $2,708,634.68 |
| | | | | |
| LILIEN | 2/15/2007 | 5,603 | $24.10 | $135,032.30 |
| | 2/15/2007 | 2,721 | $24.10 | $65,576.10 |
| | 5/3/2007 | 8,037 | $22.75 | $182,841.75 |
| | 5/3/2007 | 6,759 | $22.75 | $153,767.25 |
| | 5/25/2007 | 10,685 | $22.65 | $242,015.25 |
| | | 33,805 | | $779,232.65 |
| | | | | |
| SIMMONS | 1/29/2007 | 2,000 | $23.82 | $47,640.00 |
| | 1/29/2007 | 1,337 | $23.84 | $31,874.08 |
| | 1/29/2007 | 5,000 | $23.85 | $119,250.00 |
| | 1/29/2007 | 1,000 | $23.86 | $23,860.00 |
| | 1/29/2007 | 2,000 | $23.87 | $47,740.00 |
| | 1/29/2007 | 2,663 | $23.88 | $63,592.44 |
| | 1/29/2007 | 3,000 | $23.89 | $71,670.00 |
| | 1/29/2007 | 3,070 | $23.90 | $73,373.00 |
| | 1/29/2007 | 1,000 | $23.92 | $23,920.00 |
| | 1/29/2007 | 2,000 | $23.93 | $47,860.00 |
| | 1/29/2007 | 1,930 | $23.94 | $46,204.20 |
| | 2/15/2007 | 1,868 | $24.10 | $45,018.80 |
| | 2/15/2007 | 662 | $24.10 | $15,954.20 |
| | 4/23/2007 | 5,000 | $21.65 | $108,250.00 |
| | 4/23/2007 | 5,000 | $21.70 | $108,500.00 |
| | 4/23/2007 | 2,500 | $21.75 | $54,375.00 |
| | 4/23/2007 | 10,000 | $21.80 | $218,000.00 |
| | 4/23/2007 | 2,500 | $21.90 | $54,750.00 |
| | 5/3/2007 | 2,887 | $22.75 | $65,679.25 |
| | 5/3/2007 | 1,698 | $22.75 | $38,629.50 |
| | | 57,115 | | $1,306,140.47 |
| | | | | |
| TOTAL: | | 205,267 | | $4,794,007.80 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.    Plaintiff brings this action derivatively in the right and for the benefit of E*Trade to redress injuries suffered, and to be suffered, by E*Trade as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by Individual Defendants. E*Trade is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

59.    Plaintiff will adequately and fairly represent the interests of E*Trade in enforcing and prosecuting its rights.

60.    Plaintiff is and was an owner of the stock of E*Trade during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

61.    The current Board of E*Trade consists of the following ten individuals: defendants Caplan, Lilien, Brewster, Fisher, Hayter, Parks, Raffaeli, Randall, Weaver and Willard.

62.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding E*Trade's true business prospects and the true value of mortgage related asset portfolio. While in possession of this material adverse non-public information regarding the Company, the following current members of the E*Trade Board participated in the illegal insider selling by selling the following amounts:

        (a)    while in possession of adverse non-public information, Caplan sold 114,347 shares of E*Trade stock for proceeds of $2,708,634.68; and

        (b)    while in possession of adverse non-public information, Lilien sold 33,805 shares of E*Trade stock for proceeds of $779,232.65.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently

substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

63.     Defendants Brewster, Parks, Randall, Weaver and Willard were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the Committee is responsible for reviewing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of E*Trade's earnings press releases and guidance. Accordingly, defendants Brewster, Parks, Randall, Weaver and Willard breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained improper material information. Particularly, these defendants reviewed and failed to correct E*Trade's improper earnings press releases and guidance described above. Thus, Brewster, Parks, Randall, Weaver and Willard face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

64.     The principal professional occupation of Caplan is his employment with E*Trade, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, E*Trade paid Caplan the following compensation:

| Defendant | Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| Caplan | 2006 | $750,000 | $1,724,928 | $2,612,943 | $4,700,000 | $157,635 |

Accordingly, Caplan lacks independence from defendants Brewster, Fisher, Parks, Raffaeli and Willard, who are not disinterested and/or independent and who exert influence over Caplan's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Caplan's base salary, bonus and equity compensation. This lack of independence rendered defendant Caplan incapable of impartially considering a demand to commence and vigorously prosecute this action.

-23-

65.    The principal professional occupation of Lilien is his employment with E*Trade, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, E*Trade paid Lilien the following compensation:

| Defendant | Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|-----------|-------------|--------|--------------|---------------|----------------------------------------|------------------------|
| Lilien | 2006 | $650,000 | $1,278,560 | $1,944,868 | $3,800,000 | $93,509 |

Accordingly, Lilien lacks independence from defendants Brewster, Fisher, Parks, Raffaeli and Willard, who are not disinterested and/or independent and who exert influence over Lilien's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Lilien's base salary, bonus and equity compensation. This lack of independence rendered defendant Lilien incapable of impartially considering a demand to commence and vigorously prosecute this action.

66.    Defendants Caplan, Lilien, Brewster, Fisher, Hayter, Parks, Raffaeli, Randall, Weaver and Willard as members of the Board during the Relevant Period authorized the buyback of over $118 million worth of the Company's shares at artificially inflated prices. The Board's decision to authorize the share buyback was not the product of valid business judgment. Further, defendants Caplan and Lilien engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

67.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

68.    The Director Defendants of E*Trade, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from E*Trade's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

69.    In order to bring this suit, all of the directors of E*Trade would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

-24-

70.     The acts complained of constitute violations of the fiduciary duties owed by E*Trade's officers and directors and these acts are incapable of ratification.

71.     Each of the Director Defendants of E*Trade authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

72.     Any suit by the current directors of E*Trade to remedy these wrongs would likely expose the Individual Defendants and E*Trade to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

73.     E*Trade has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for E*Trade any part of the damages E*Trade suffered and will suffer thereby.

74.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recovery for E*Trade for any of the wrongdoing alleged by plaintiff herein.

75.     Plaintiff has not made any demand on shareholders of E*Trade to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     E*Trade is a publicly held company with over 423 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

-25 -

## COUNT I

### Derivatively Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     During the Relevant Period, the Individual Defendants disseminated or approved public statements that improperly portrayed the value of E*Trade's mortgage related asset portfolio and business prospects. The Individual Defendants knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that the Company's public statements concerning its business prospects were misleading.

78.     The Insider Selling Defendants also sold nearly $5 million worth of shares of E*Trade's common stock at inflated prices during the Relevant Period while in possession of material non-public information.    These defendants misappropriated E*Trade's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold E*Trade stock without disclosing the information alleged to have been concealed herein.

79.     At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of E*Trade's mortgage related asset portfolio and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing E*Trade to repurchase over $118 million worth of its own stock on the open market at an average inflated price of approximately $23 per share, which is substantially higher than E*Trade's current share price of $13.35.

80.     As such, the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon E*Trade and others in connection with their purchases of E*Trade common stock during the Relevant Period.

81.    As a result of the Individual Defendants' misconduct, E*Trade has and will suffer damages in that it paid artificially inflated prices for E*Trade common stock purchased on the open market. E*Trade would not have purchased E*Trade common stock at the prices it paid, had the market previously been aware that the market price of E*Trade's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, E*Trade suffered damages in connection with its purchases of E*Trade common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty for Improper Financial Reporting

82.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.    The Individual Defendants owed and owe E*Trade fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe E*Trade the highest obligation of good faith, fair dealing, loyalty and due care.

84.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

85.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. In particular, E*Trade's Relevant Period statements improperly portrayed the value of its mortgage related asset portfolio and its business prospects. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, E*Trade has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff, on behalf of E*Trade, has no adequate remedy at law.

### COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold E*Trade common stock on the basis of such information.

90.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold E*Trade common stock.

91.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of E*Trade common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

92.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### COUNT IV

### Against All Defendants for Breach of Fiduciary Duty for Abuse of Control

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence E*Trade, for which they are legally responsible.  In particular, the

-28 -

Individual Defendants abused their positions of authority by causing or allowing E*Trade to issue statements that improperly portrayed the value of its mortgage related asset portfolio and its business prospects.

95.     As a direct and proximate result of the Individual Defendants' abuse of control, E*Trade has sustained significant damages. These damages include, but are not limited to, E*Trade's severe loss of market credibility as reflected in its $3.8 billion market capitalization loss and substantial costs in connection with the securities class action lawsuit.

96.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of E*Trade, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of E*Trade in a manner consistent with the operations of a publicly held corporation.

100.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, E*Trade has sustained significant damages in excess of hundreds of millions of dollars.

101.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

102.    Plaintiff, on behalf of E*Trade, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying bonuses to certain of its executive officers and incurring potentially tens of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

105.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

106.    Plaintiff, on behalf of E*Trade, has no adequate remedy at law.

COUNT VII

**Against All Defendants for Unjust Enrichment**

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of E*Trade.

109.    Plaintiff, as a shareholder and representative of E*Trade, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding E*Trade damages;

-30 -

C. Directing E*Trade to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect E*Trade and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of E*Trade to nominate at least three candidates for election to the Board;

3. a proposal to ensure the accuracy of the qualifications of E*Trade's directors, executives and other employees;

4. a proposal to control insider selling; and

5. appropriately test and then strengthen the internal audit and control functions.

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of E*Trade has an effective remedy;

E. Awarding to E*Trade restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October __, 2007                LAW OFFICES OF THOMAS G. AMON
                                       THOMAS G. AMON

-31 -

_____
THOMAS G. AMON  (TGA 1515)

500 Fifth Avenue, Suite 1650
New York, N.Y. 10110
Telephone: (212) 810-2431
Facsimile: (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
MARK A. GOLOVACH
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

285453_3.DOC

## VERIFICATION

I, Brian J. Robbins, hereby declare as follows:

1.     I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the E*TRADE Financial Corporation action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 3rd day of October, 2007, at San Diego, California

_____
BRIAN J. ROBBINS