UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— X

CATHERINE RUBERY, Derivatively on :
Behalf of E*TRADE FINANCIAL :
CORPORATION, :
                     :
            Plaintiff, :
                     :
    vs. :
                     : Civil Action No. 07 Civ. 8612 (JPO)
MITCHELL H. CAPLAN, ROBERT J. :
SIMMONS, R. JARRETT LILIEN, DENNIS :
E. WEBB, MICHAEL K. PARKS, LEWIS E. : Electronically Filed
RANDALL, DONNA L. WEAVER, :
STEPHEN H. WILLARD, RONALD D. :
FISHER, C. CATHLEEN RAFFAELI, :
GEORGE A. HAYTER, and DARYL G. :
BREWSTER, :
                     :
            Defendants, :
                     :
    -and- :
                     :
E*TRADE FINANCIAL CORPORATION, a :
Delaware corporation, :
                     :
            Nominal Defendant. :
                     :

———————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION
<u>FOR PRELIMINARY APPROVAL OF SETTLEMENT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I. INTRODUCTION ..................................................................................... 1

II. BACKGROUND OF THE ACTION AND SETTLEMENT NEGOTIATIONS .............. 5

    A. Procedural History of the Action ....................................................... 5

    B. Settlement Negotiations .................................................................. 8

III. TERMS OF THE PROPOSED SETTLEMENT ................................................ 9

    A. Strengthened Board Independence ...................................................... 9

    B. Improved Board Competence ........................................................... 10

    C. Enhanced Internal Audit Function and Board Oversight ......................... 10

    D. Enhanced Board Oversight of Financial Disclosures and Guidance ............ 11

    E. Improved Enterprise Risk Management ("ERM") Function and Board Oversight .................................................................................... 12

    F. Enhanced Board Oversight Over Loan Loss Reserves ............................ 12

    G. Enhanced Board Oversight of New Business Initiatives ......................... 13

    H. Enhanced Board Oversight of Stock Repurchases ................................. 13

    I. Enhanced Compliance Function and Board Oversight ............................ 14

    J. Alignment of Compensation with Corporate Objectives ......................... 14

    K. Attorneys' Fees and Reimbursement Expenses .................................... 15

IV. THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL .......................... 15

    A. Applicable Legal Standards ............................................................. 15

    B. The Settlement Falls Within the Range of Possible Final Approval ............ 17

        1. The Settlement Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel, and Is Therefore Presumptively Fair ......................................................... 17

        2. The Non-Monetary Recovery Secured for E*TRADE Is Fair and Reasonable in Light of the Serious Risks of Establishing Liability and Damages .................................................................. 18

        3. Continued Litigation Would Be Complex, Time-Consuming and Expensive ...................................................................... 21

   4. Sufficient Information Has Been Adduced at this Stage of the Proceedings to Warrant Preliminary Approval ...........................................22

V. THE PROPOSED NOTICE OF SETTLEMENT IS ADEQUATE ..................................22

VI. PROPOSED SCHEDULE OF EVENTS ...........................................................................24

VII. CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*AOL Time Warner S'holder Derivative Litig.*,
2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ............................................................. 18, 22

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993) .................................................................................... 16, 18, 21

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)
*abrogated on other grounds by Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) .................................................................................... 16, 18, 21

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d. Cir. 2001) .......................................................................................... 17, 22

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ............................................................................................................ 21

*In re Apple Computer, Inc., Deriv. Litig.*,
2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) .................................................................... 18

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................................................ 17

*In re Currency Conversion Fee Antitrust Litig.*,
2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) .................................................................... 16

*In re Drexel Burnham Lambert Group*,
995 F.2d 1138 (2d Cir. 1993) ............................................................................................ 23

*In re Lloyd's Am. Trust Fund Litig.*,
2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ................................................................ 21

*In re Metro. Life Derivative Litig.*,
935 F.Supp. 286 (S.D.N.Y. 1996) ..................................................................................... 21

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ........................................................................................ 16

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ............................................................................................... 20

*In re PaineWebber Ltd. P'ships. Litig.*,
171 F.R.D. 140 (S.D.N.Y. 1997) ...................................................................................... 22

*In re Prudential Sec. Inc. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................................... 16

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
2008 WL 185809 (D.N.J. Jan. 14, 2008) .......................................................................... 19

*In re Telik, Inc. Sec. Litig.*,
    576 F.Supp.2d 570 (S.D.N.Y. 2008).................................................................. 17

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000)............................................................................. 17

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) ....................................................................... 20

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)................................................................................. 18, 19

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)........................................................................................ 21

*Republic Nat'l Life Ins. Co. v. Beasley*,
    73 F.R.D. 658 (S.D.N.Y. 1977) ................................................................. 15, 20

*Schimmel v. Goldman*,
    57 F.R.D. 481 (S.D.N.Y. 1973) ................................................................. 15, 20

*True v. Am Honda Motor Co.*,
    2009 WL 838284 (C.D. Cal. Mar. 25, 2009) .................................................. 16

*Unite Nat'l Ret. Fund v. Watts*,
    2005 WL 2877899 (D.N.J. Oct. 28, 2005)...................................................... 19

*W. Va. v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970),
    *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ............................................................... 21

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)............................................................................. 17

## RULES, STATUTES, AND OTHER AUTHORITIES

Fed. R. Civ. P.
    Rule 23.1 ................................................................................................ *passim*

Fed. R. Civ. P.
    Rule 23.1(c) .................................................................................................... 16

*Manual for Complex Litigation* (4th ed. 2004),
    §21.632............................................................................................................ 16

*Manual for Complex Litigation, Third* (1995),
    § 30.41 ............................................................................................................ 16

## I.      INTRODUCTION

Plaintiffs[1] Marilyn Clark and Catherine Rubery, derivatively on behalf of E*TRADE Financial Corporation ("E*TRADE" or the "Company"), respectfully submit this memorandum in support of their Unopposed Motion for Preliminary Approval of Settlement (the "Motion"). The Motion seeks entry of an order (the "Preliminary Approval Order") that will: (i) preliminarily approve the Settlement set forth in the Stipulation executed by the Parties on October 2, 2012; (ii) approve the form and manner of providing to Current E*TRADE Shareholders the Notice of Pendency and Proposed Settlement of Action ("Notice") to be filed via a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") and publication of the Summary Notice of Pendency and Proposed Settlement of Action ("Summary Notice") in *Investor's Business Daily*; and (iii) schedule a hearing pursuant to Rule 23.1 of the Federal Rules of Civil Procedure at which the Court will consider final approval of the Settlement and the amount in fees and expenses that would fairly and reasonably compensate Plaintiffs' Counsel for the substantial benefit conferred upon E*TRADE in light of, *inter alia*, the significant risks Plaintiffs' Counsel undertook in commencing and litigating this action (the "Action") on the Company's behalf and the substantial time and resources Plaintiffs' Counsel devoted to the Action.[2]

The Settlement calls for E*TRADE's implementation and maintenance of a comprehensive set of corporate governance and oversight reforms designed to prevent recurrence

---

[1] All capitalized terms that are not otherwise defined shall have the same definitions as set forth in the Stipulation of Settlement dated October 2, 2012 and filed concurrently herewith (the "Stipulation").

[2] Despite extensive negotiations and mediation supervised by an experienced former federal judge, the Parties disagree about the appropriate amount that should be awarded in fees and expenses.  The issues relating to the fee and expense award will be addressed in briefing to be completed in time for consideration during the hearing on final approval of the Settlement.  *See* Stipulation, ¶5; Preliminary Approval Order, ¶¶8-10.

of the alleged wrongdoing and oversight lapses alleged to have injured E*TRADE (the "Reforms" or "Corporate Governance Reforms") and for the dismissal of the above-captioned consolidated derivative action filed on behalf of the Company.

The Settlement guarantees immediate and substantial benefits to E*TRADE, the real party in interest in this shareholder derivative action.  As a result of the Settlement, E*TRADE will implement and maintain a comprehensive set of corporate governance reforms that directly address the alleged lapses Plaintiffs contend permitted the Individual Defendants to shift E*TRADE's focus from its conservative securities brokerage business to residential lending and mortgage-backed securities investments without adequate Board oversight, risk mitigation, or disclosure controls to ensure that shareholders were kept apprised of the materially higher risks of E*TRADE's new operational focus.  *See* Stipulation, Ex. A; Section III, *infra*.  The Reforms will

- enhance the Board's financial expertise, information, and independence;

- increase the rigor of Board- and management-level supervision of internal controls over accounting and financial reporting, material risks, and related disclosures;

- strengthen E*TRADE's internal audit function and internal controls environment;

- improve capital and risk management, contingent loss reserve estimation and reporting, and the mitigation and disclosure of enterprise risks associated with major strategic initiatives (like the move into residential lending and mortgage-backed securities) and stock repurchases;

- enhance the compliance function and Board oversight to ensure compliance with E*TRADE's stated credit policies and credit risk controls, and appropriate escalation of material compliance risks; and

- reduce incentives for executives to manipulate short-term financial results by requiring the Compensation Committee to make executive compensation decisions based on the achievement of defined corporate objectives, and to disclose and explain the material factors in compensation decisions – including any material departures from pre-established factors – in E*TRADE's annual proxy statement. *Id.*

Pursuant to the Settlement, E*TRADE will (with limited potential exceptions) maintain these measures for no less than four years – more than enough time to ensure these practices become embedded in E*TRADE's corporate culture. Stipulation, ¶2.1. By directly addressing the alleged Board- and management-level oversight lapses Plaintiffs contend permitted the alleged wrongdoing to occur, the Reforms will substantially reduce the likelihood that E*TRADE will suffer the consequences of similar lapses in the future. The Reforms further enhance shareholder value by helping to restore investor confidence in the effectiveness of E*TRADE's enterprise risk management and the integrity of the Company's public disclosures.

E*TRADE agrees that "the Company's decision to adopt or maintain the Corporate Governance Reforms, including policy and procedural changes to the Audit Committee Charter, Governance Committee Charter, Risk Oversight Committee Charter, and Corporate Governance Guidelines implemented prior to Settlement, was guided by and/or would not have been made but for the institution, prosecution, and settlement of the Action." Stipulation, ¶2.2. "E*TRADE and the Individual Defendants further acknowledge and agree that the Corporate Governance Reforms confer substantial benefits upon E*TRADE and Current E*TRADE shareholders by, among other things, improving decision-making processes and procedures and enhancing effective Board oversight of core operations, material risks, and disclosures." *Id.*, ¶2.3.

The Settlement of this complex litigation was the product of substantial effort, vigorous advocacy, and arm's-length negotiations by skilled and experienced counsel over many months. Plaintiffs have carefully weighed the substantial benefits the Settlement guarantees for the Company against the significant risks, costs and delay that would be entailed in attempting to secure a better result through further litigation.  Plaintiffs' Counsel's recommendation that the Court approve the Settlement is based on counsel's significant experience in shareholder derivative litigation and is informed by, among other things, counsel's extensive pre- and post-commencement investigation; careful evaluation of the information obtained through discovery in the factually related securities fraud class action captioned, *Freudenberg v. E\*TRADE Financial Corp.*, No. 7 Civ. 08538 (JPO) (MHD) (the "Securities Class Action"), including millions of pages of documents and written discovery responses; rigorous evaluation of the strengths and weaknesses of the claims and defenses; and a comparison of the relative value of the corporate governance achievable through settlement and the risks and rewards of continued litigation.

The Parties also agree that Plaintiffs are entitled to an award of reasonable attorneys' fees reflecting, among other factors, the benefits conferred by the Settlement and the risks undertaken in pursuing the Action, as well as compensation for reasonable expenses incurred in prosecuting the Action.  Stipulation, ¶5.1.  The Parties disagree regarding the amount of attorneys' fees and expenses that should be awarded, however, and have agreed to present the matter to the Court for resolution through briefing on a separate fee and expense application.  *See id.*, ¶5.2; Preliminary Approval Order, ¶¶8-10.  The Summary Notice and Notice submitted jointly by the Parties to the Court for approval shall inform E\*TRADE's shareholders the maximum amount of fees and expenses Plaintiffs and Plaintiffs' Counsel will apply for.  *See* Stipulation, Exs. C-D.  Under the

Parties' proposed schedule, *see infra* at Section VI., Plaintiffs will file the Fee and Expense Application, which will include the actual amount of fees and expenses that Plaintiffs and Plaintiffs' Counsel seek, well in advance of the deadline by which E*TRADE shareholders may object to the Settlement.

At the preliminary approval stage, the Court need only conclude that the Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that Notice of the Settlement should be provided to E*TRADE's shareholders and the Settlement Hearing be scheduled. As discussed herein, the Settlement easily meets this standard, and, therefore, the Court should preliminarily approve the Settlement and enter the Preliminary Approval Order.

## II.    BACKGROUND OF THE ACTION AND SETTLEMENT NEGOTIATIONS

### A.    Procedural History of the Action

E*TRADE is a Delaware corporation that offers financial services to retail and institutional customers worldwide.

On October 4, 2007, two actions captioned, respectively, *Rubery v. Caplan, et al*., Case No. 07-CV-8612 and *Clark v. Caplan, et al*., Case No. 07-CV-8619 were filed derivatively on behalf of E*TRADE in the U.S. District Court for the Southern District of New York.[3] Plaintiffs each alleged that Defendants failed to disclose material adverse facts about the Company's business, prospects, and financial condition, including that the Company was experiencing

---

[3] In addition, on November 13, 2007, November 21, 2007, and December 3, 2007, respectively, three actions captioned *Guiseppone v. Caplan, et al.*, Index No. 07-603736, *Fosbre v. Caplan, et al.*, Index No. 07-603875, and *Kallinen v. Caplan, et al.*, Index No. 07-603974, were filed in the Supreme Court of the State of New York, County of New York. These three cases were consolidated on January 29, 2008 (the "State Action"). This consolidated action was voluntarily dismissed on February 4, 2011, after briefing was completed on the defendants' motion to dismiss, capturing the efficiencies of prosecuting the claims on E*TRADE's behalf in a single forum and leveraging the (federal derivative) Action's superior complaint and access to discovery in the Securities Class Action. Counsel for the State Action plaintiffs appeared as additional counsel in the Action on March 18, 2011, March 22, 2011, and August 31, 2011.

increases in mortgage delinquencies and that the Defendants had failed properly to reserve and account for probable loan losses.  Plaintiffs further alleged that, as a result of improvident lending in violation of stated underwriting policies, the Company would incur significant asset write downs, charge-offs, and losses and would be forced out of the wholesale mortgage business.

On January 8, 2008, the Court entered a stipulated order consolidating the two actions, appointing Robbins Umeda LLP and the Law Offices of Thomas G. Amon as Co-Lead Counsel, and setting a schedule for filing a consolidated amended complaint and briefing on any motions to dismiss.[4]

On May 11, 2010, the Court entered an order denying defendants' motion to dismiss the Securities Class Action.  On June 25, 2010, the defendants filed their Answer, denying substantially all material allegations.

On July 26, 2010, Plaintiffs filed their 369-paragraph Verified Consolidated Amended Shareholder Derivative Complaint (the "Complaint").  The Complaint asserted claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution for costs of defense and satisfying judgment or settling the Securities Class Action. Plaintiffs undertook extensive independent research into the applicable Generally Accepted Accounting Principles ("GAAP"), economic, credit market and capital risk issues, and disclosure matters underlying their claims on behalf of E*TRADE.  The Complaint alleged that certain E*TRADE officers and directors breached their fiduciary duties to the Company by, *inter alia*, causing or allowing E*TRADE to: (i) shift E*TRADE's core business focus from its

---

[4] The briefing schedule specified that Plaintiffs' consolidated amended complaint was to be filed sixty days after a ruling on a motion to dismiss in the factually related Securities Class Action.

conservative and relatively low-risk securities brokerage to a far riskier business model dominated by retail mortgage lending and mortgage-backed securities investments without adequately controlling, mitigating, and disclosing those risks; (ii) violate E*TRADE's stated lending policies by purchasing low credit quality loans from third party originators, including subprime loan originators; (iii) fail properly to reserve and account for probable loan losses under applicable GAAP rules; (iv) make misleading statements or omissions in its public filings and commentary to securities analysts concerning the origins of E*TRADE's mortgage loans and the likelihood of losses in the Company's mortgage lending business division; and (v) authorize and permit the expenditure of nearly $200 million dollars on repurchases of E*TRADE stock knowing or consciously disregarding the fact that the stock price was artificially inflated by misleading statements and omissions published on behalf of the Company.

After Plaintiffs filed the Complaint, the Parties conferred and determined that it would be in the best interests of the Company to stay the Action during the pendency of the factually related Securities Class Action and for Plaintiffs to be provided contemporaneously with all discovery generated in that case. On September 22, 2010, the Court entered an order consistent with the Parties' stipulation (the "September 22, 2010 Order") providing that Defendants would be required to answer, move, or otherwise respond to the Complaint within sixty days of the close of expert discovery in the Securities Class Action, and that, subject to the execution of a protective order, Defendants would provide Plaintiffs with copies of all documents, transcripts of all depositions, and copies of all written discovery responses generated in the Securities Class Action.

Pursuant to the September 22, 2010 Order, the Parties entered into a confidentiality stipulation on October 13, 2010. Defendants began producing documents to Plaintiffs on

October 18, 2010.  Between October 2010 and September 2011, Defendants produced more than 12 million pages of documents from nearly fifty different custodians.  In addition, Defendants produced several sets of responses to interrogatories.  Plaintiffs' Counsel undertook a diligent review of the enormous document production and voluminous written discovery responses. Plaintiffs' Counsels' document review and analysis included a page-by-page review of the documents produced by ten key custodians Plaintiffs allege to have been directly involved in the alleged wrongdoing, and detailed analysis of documents generated by carefully crafted key word searches run against the entire 12 million-page database of documents.

### B.    Settlement Negotiations

In fall of 2011, the Parties commenced preliminary settlement discussions.  Defendants requested that Plaintiffs send a settlement demand letter.  On September 29, 2011, Plaintiffs' Counsel sent Defendants' Counsel a settlement demand ("September 29, 2011 Demand Letter").

On January 9, 2012, the Settling Parties participated in a teleconference during which they discussed possible resolution of the Action based on the framework supplied in Plaintiffs' September 29, 2011 Demand Letter.  Over the course of the next four months, the Settling Parties participated in several teleconferences and exchanged numerous letters setting forth comprehensive and detailed settlement proposals, counter-proposals, and related arguments.

On or about May 15, 2012, the Settling Parties reached an agreement in principle on the terms and conditions of the proposed settlement, as reflected in the Stipulation.  Plaintiffs and E*TRADE agree that a settlement at this juncture on the terms and conditions set forth in the Stipulation is fair, reasonable, adequate, and in the best interests of E*TRADE and its shareholders.  The Board of Directors of E*TRADE, exercising its business judgment, has approved the Settlement and each of its terms in the best interests of E*TRADE and its shareholders.  *See* Stipulation at 5.1.

## III.    TERMS OF THE PROPOSED SETTLEMENT

The Settlement offers E*TRADE and its shareholders the substantial, immediate, and lasting benefits of Reforms that directly address the Board's alleged failure to ensure that management fully disclosed, properly accounted for, and reasonably mitigated the heightened risks entailed in E*TRADE's strategic shift to mortgage-based businesses, particularly as the residential real estate and related credit market crises escalated from 2006 through 2008. The Settlement substantially reduces the probability that E*TRADE will suffer the consequences of similar alleged lapses in the future and will help to restore investor confidence in the effectiveness of the Company's enterprise risk management and the integrity of its public disclosures.

### A.    Strengthened Board Independence

To ensure the Board is sufficiently independent of management to provide vigorous and objective oversight, the Reforms: (i) require the Board to be made up of a majority of independent directors; (ii) require the Audit, Governance, and Compensation Committees to be staffed exclusively with independent directors, and the Risk Oversight Committee ("ROC") to be staffed with a majority of independent directors; (iii) mandate executive session meetings by the whole Board and the Audit and Compensation Committees; (iv) prohibit directors from chairing more than one standing committee of the Board; (v) separate the Chair of the Board and CEO, or, where the roles are combined, require election by non-management directors of an independent Lead Director with authority to schedule and determine the agenda for Board meetings, chair all executive sessions, require management to provide information to the Board, oversee the Board's retention of independent advisors, assist the Compensation Committee and whole Board in evaluating the CEO's performance, and ensure the Board exercises oversight independently and with due care; and (vi) require the Governance Committee to consider

director candidates submitted by any non-competitor stockholder who has continuously held at least 5% of E*TRADE's voting stock for a year or more.

### B.  Improved Board Competence

To ensure the Board has the requisite skills and experience to meaningfully supervise E*TRADE's complex operations and finances, the Governance Committee is charged with: (i) periodically reviewing the composition of the Board and recommending the addition or removal of directors to ensure adequate expertise, experience, and skill sets to meet new challenges and needs; (ii) annually assessing the performance of the Board's committees and making recommendations for changes to the whole Board; and (iii) developing and overseeing a new director orientation program and a continuing education program for all directors.  The Audit Committee must be staffed by a super-majority of members who qualify as financial experts under Section 407 of the Sarbanes-Oxley Act.  And all Board committees are empowered to retain expert advisors without management or Board approval.

### C.  Enhanced Internal Audit Function and Board Oversight

The Reforms include a number of measures designed to address the alleged lapses in internal controls over accounting and financial reporting Plaintiffs contend contributed to the failure to identify, disclose, and properly account for the risks of loan and MBS portfolio losses.

First, the Internal Audit Department is explicitly charged with assisting the Audit Committee in carrying out its oversight duties.  Internal Audit's responsibilities now include reviewing on an on-going basis the financial information provided to regulators and the public, and the Company's internal controls over finance, accounting, legal compliance, and ethics. Internal Audit is required to issue written reports upon completion of each business unit audit rating the effectiveness of the unit's internal controls, recommending improvements, and outlining management's plans for addressing the recommendations.  The report is to be provided

to the unit's top manager, the CEO, CFO, and Chief Risk Officer, and E*TRADE's outside auditor, ensuring objective input and management accountability.

Second, Internal Audit is required to prepare and review with the Audit Committee quarterly a summary of audit activity and significant matters, ensuring that the Audit Committee has adequate and timely information regarding the effectiveness of the Internal Audit function and any significant accounting and reporting issues discovered by Internal Audit.

Third, the Audit Committee, in turn, must report to the whole Board at least quarterly regarding any significant issues that may affect the quality or integrity of the Company's financial statements and any significant internal controls deficiencies, enabling the whole Board to exercise meaningful oversight of E*TRADE's public disclosures.

Fourth, the Audit Committee is required at least annually to: (i) evaluate the performance, responsibilities, budget, and staffing of Internal Audit; (ii) review the plans for and results of internal audits, and assess their effectiveness in identifying weaknesses in internal controls; and (iii) make recommendations regarding staffing, resources, policies and procedures, and the frequency and scope of internal audits to ensure their efficacy.

### D.   Enhanced Board Oversight of Financial Disclosures and Guidance

The Audit Committee is now required to meet quarterly with management, the internal auditors, and E*TRADE's outside auditor to conduct a pre-publication review of quarterly and annual financial statements and earnings guidance to assess, *inter alia*: (i) significant reporting issues and management judgments made in connection with those disclosures; (ii) the effect of regulatory and accounting initiatives on E*TRADE's disclosure obligations; and (iii) changes in management's selection or application of accounting principles.

### E.  Improved Enterprise Risk Management ("ERM") Function and Board Oversight

Several measures address the alleged failures to identify, mitigate, and disclose the financial, credit, investment, and liquidity risks associated with E*TRADE's shift to a mortgage-driven business model and the market dynamics that magnified those risks.

The ROC is now explicitly charged with reviewing the Company's ERM framework and charters of senior ERM committees, and the policies and procedures for assessing and managing exposure to operational, credit, market, interest rate, investment, and liquidity risk, including counterparty credit risks and trading limits critical to safe asset management.

The ROC is required to meet quarterly with the Chief Risk Officer to review financial risks, including interest rate sensitivity, liquidity ratios, capital adequacy, market exposures, and funding mix, and actions taken by management to address these risks.

In addition, the ROC is required to determine at least annually whether changes in market or economic conditions, legal or regulatory requirements, and/or the volume and severity of loan delinquencies warrants re-evaluation of the models and historical assumptions used to estimate loan losses, calculate reserves, and set underwriting standards.

### F.  Enhanced Board Oversight Over Loan Loss Reserves

Amplifying the effectiveness of this more rigorous control environment, the reforms specifically require the ROC to oversee management's estimates and judgments in determining loan loss reserves each reporting period (i.e., "ALLL" and "PLLL").  The ROC is required to: (i) review and evaluate annually E*TRADE's policies and procedures for establishing loan loss reserves; (ii) review management's rationale for the loss estimates and reserves reported each period; and (iii) periodically require management to validate and, if necessary, revise its methodology for estimating loan losses and calculating changes to reserve levels.

### G.     Enhanced Board Oversight of New Business Initiatives

In addition to more rigorous oversight of internal controls and financial, operational, and credit risk, the reforms require the Board to designate either the Audit Committee or the ROC to conduct a comprehensive risk review of significant new business initiatives and strategies that face significant and material risks.   Where risks are found to be material, the designated committee must meet in executive session and formulate a recommendation to the whole Board regarding: (i) whether E*TRADE's current compliance and risk management infrastructure is adequate to manage, mitigate, and disclose the new risks; and (ii) whether additional disclosures are necessary to properly account for and manage significant new risks or loss contingencies arising out of new business or strategic initiatives.   Businesses/strategies that are approved are subject to ongoing heightened monitoring of internal controls and risk mitigation and disclosure.

### H.     Enhanced Board Oversight of Stock Repurchases

Risk and disclosure issues arising from stock buybacks also are subject to more rigorous supervision.

Before authorizing stock repurchases, the Board is now required to evaluate and confirm that the proposed repurchases: (i) would be the best use of cash; (ii) are consistent with sound capital management; (iii) are not intended to facilitate short-term stock price manipulation; and (iv) will not, alone or in combination with known or foreseeable material loss contingencies, have a material negative impact on E*TRADE's liquidity or capital structure.

The Board is also required to review repurchases made pursuant to its authorizations each quarter and evaluate whether changes in (i) actual or expected operational performance; (ii) business strategy; (iii) risk profile; (iv) liquidity and capital needs; (v) stock price; and (vi) material undisclosed information warrant reconsideration of the program.

### I.      Enhanced Compliance Function and Board Oversight

Several measures address the alleged failure to comply with E*TRADE's stated credit policies and credit risk controls.

First, the Chief Compliance Officer is now explicitly charged with implementing a monitoring program to identify significant compliance issues and to ensure that E*TRADE's internal controls minimize non-compliance.

Second, the Chief Compliance Officer, Chief Risk Officer, and/or Chief Legal Officer must prepare a regular report for the Audit Committee or ROC regarding material risk and compliance issues.

Third, the Audit Committee or ROC, in turn, is required to escalate material legal or regulatory compliance issues to the whole Board.

Fourth, E*TRADE must maintain a confidential ethics hotline to receive reports about compliance and ethical violations.  The reports must be reviewed by the General Counsel or his/her designee, and summaries, including the disposition of each report, must be provided to the Audit Committee.

### J.      Alignment of Compensation with Corporate Objectives

The Reforms reduce the incentives for manipulating reported financial results by requiring the Compensation Committee to identify specific corporate objectives and make compensation decisions based on a transparent evaluation of each executive's contribution to their achievement.  The factors material to each named executive officer's compensation must be disclosed in E*TRADE's annual proxy statement, and any material departures from the pre-established factors must be disclosed and explained, and approved by the Compensation Committee or recommended by the Compensation Committee for approval by a majority vote of the whole Board.

This comprehensive set of reforms will enhance shareholder value by improving decision-making, and restoring investor confidence in E*TRADE's risk management and the integrity of its public disclosures.

As noted, E*TRADE acknowledges and agrees that the Company's decision to adopt or maintain the Corporate Governance Reforms, including policy and procedural changes to the Audit Committee Charter, Governance Committee Charter, Risk Oversight Committee Charter, and Corporate Governance Guidelines implemented prior to the Settlement, was guided by and/or would not have been made but for the institution, prosecution, and settlement of the Action.  Stipulation, ¶2.2.  E*TRADE and the Individual Defendants further acknowledge and agree that the Corporate Governance Reforms confer substantial benefits upon E*TRADE and Current E*TRADE Shareholders by, among other things, improving decision-making processes and procedures and enhancing effective Board oversight of core operations, material risks, and disclosures.  *Id*., ¶2.3.

### K.   Attorneys' Fees and Reimbursement Expenses

Plaintiffs and Plaintiffs' Counsel intend to petition the Court for an award of fees and expenses in connection with the Action (the "Fee and Expense Application").  *Id*., ¶5.1; Preliminary Approval Order, ¶¶8-10.

## IV.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   Applicable Legal Standards

The settlement of disputed claims, especially in complex class and shareholder derivative litigation, is highly favored.  *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) (settlements of shareholder derivative actions particularly favored because such litigation is "'notoriously difficult and unpredictable'") (citation omitted); *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (hereinafter "*Beasley*") (same).

Rule 23.1 requires the Court to approve any settlement of derivative claims.  Fed. R. Civ. P. 23.1(c).  "Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval followed by a final fairness hearing."  *True v. Am Honda Motor Co.*, 2009 WL 838284, at *3 (C.D. Cal. Mar. 25, 2009) (citing *Manual for Complex Litigation* §21.632 (4th ed. 2004).  At the preliminary stage, "the Court need only find that the proposed settlement fits 'within the range of possible approval'" such that it warrants public notice and a final fairness hearing.  *In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) (citation omitted); *In re Currency Conversion Fee Antitrust Litig.*, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (court need only "make 'a preliminary evaluation' as to whether the settlement is fair, reasonable and adequate") (citation omitted).

Preliminary approval should be granted unless the Court finds reasons to doubt its fundamental fairness or other obvious deficiencies.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citing *Manual for Complex Litigation*, *Third*, §30.41 (1995)).  Where proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no fundamental deficiencies, and falls within the range of possible approval, preliminary approval should be granted.  *NASDAQ*, 176 F.R.D. at 102; *see also Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993).  Review of certain of the factors courts in the Second Circuit consider in determining final approval demonstrates that the Settlement falls within the range of possible final approval.  These factors include: (i) the reasonableness of the recovery in light of the risks of establishing liability and damages; (ii) the complexity, expense and likely duration of the litigation; and (iii) the stage of the proceedings and discovery.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (hereinafter "Grinnell"), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see*

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d. Cir. 2001) (applying *Grinnell* factors); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (same).

    **B.    The Settlement Falls Within the Range of Possible Final Approval**

        **1.    The Settlement Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel, and Is Therefore Presumptively Fair**

"[A] strong presumption of fairness attaches" to settlements negotiated at arm's-length by experienced counsel. *In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d 570, 576 (S.D.N.Y. 2008); *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir 2005); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000) (where settlement "is the product of arm's-length negotiations conducted by experienced counsel knowledgeable in complex ... litigation, the Settlement will enjoy a presumption of fairness."). This presumption applies here because the Settlement is the product of months of arm's-length negotiations by highly skilled and experienced counsel. Stipulation, §I.B; Declaration of Craig W. Smith in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement ("Smith Decl."), Exs. A-B.

Plaintiffs' Counsel have decades of experience in shareholder representative litigation, and their skills have been recognized by courts across the nation in dozens of appointments to act as lead counsel in the prosecution of shareholder derivative and direct actions. *See* Smith Decl., Ex. A-B. Plaintiff's Counsel's positions in these negotiations were informed by careful analysis of the law, thorough evaluation of the facts, and rigorous examination of the best corporate governance practices applicable to E*TRADE's operations and necessary to address the alleged lapses Plaintiffs contend damaged the Company. Smith Decl., ¶3. The Individual Defendants were vigorously represented by corporate defense attorneys who are pre-eminent in the field of

securities litigation and who were familiar with the relevant facts.[5]   The Parties engaged in settlement discussions only after they had thoroughly evaluated the risks of continued litigation based on an enormous amount of documentary information that was plainly sufficient to support their recommendations regarding the fairness, adequacy, and reasonableness of the Settlement. For its part, E*TRADE's Board, with the benefit of the advice of skilled and experienced counsel, exercised its business judgment in determining to approve the Settlement as in the best interests of E*TRADE.  *See* Stipulation, at 5.

Accordingly, the Settlement enjoys a strong presumption of fairness.

> **2.      The Non-Monetary Recovery Secured for E*TRADE Is Fair and Reasonable in Light of the Serious Risks of Establishing Liability and Damages**

In determining whether to approve a shareholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest."  *Bell Atl.*, 2 F.3d at 1311 (alteration in original); *see In re Apple Computer, Inc., Deriv. Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008). Weighed against the substantial risk that continued litigation would yield no benefit for E*TRADE, the recovery here is plainly fair, reasonable and adequate.  *See Grinnell*, 495 F.2d at 462.

Courts widely recognize that "a corporation may receive a substantial benefit from a derivative suit ... regardless of whether the benefit is pecuniary in nature."  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *see AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (non-monetary benefits alone can be "substantial

---

[5]*See* Biography of Amelia T.R. Starr, Partner, Davis Polk & Wandwell LLP (*available at* http://www.davispolk.com/lawyers/amelia-starr/); Biography of Dennis E. Glazer, Partner, Davis Polk & Wandwell LLP (*available at* http://www.davispolk.com/lawyers/dennis-glazer/).

enough to merit [settlement] approval").  Non-monetary benefits confer substantial value where "the relief is intended to prevent future harm."  *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005).  A non-monetary benefit is sufficiently "substantial" to be considered fair and reasonable consideration where the benefit is "'something more than technical in its consequence and ... accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to stockholder's interest.'"  *Mills*, 396 U.S. at 396 (citation omitted).

The Corporate Governance Reforms guaranteed by the Settlement confer this sort of substantial benefit here.[6]  As set forth above, the Settlement will result in E*TRADE's implementation and maintenance of a comprehensive set of Reforms that directly address Plaintiffs' allegations and substantially reduce the likelihood the similar alleged lapses in the future will damage the Company.  In fact, the Reforms go beyond the alleged governance shortcomings Plaintiffs contend damaged the Company, strengthening E*TRADE's overall corporate governance practices and internal controls, and the independence, competence and rigor of Board oversight, generally.  These Reforms will help restore investor confidence in E*TRADE's risk management practices, and in the accuracy and integrity of its public disclosures.

---

[6]  Indeed, recent court-approved settlements of shareholder derivative actions brought on behalf of companies that, like E*TRADE, operate in heavily regulated industries, provide strong support for recognizing the substantial benefits conferred by comprehensive risk management, compliance, internal control, and disclosure reforms.  *See, e.g.*, *In re Forest Labs., Inc. Derivative Litig.*, No. 05-CV-3489, slip op. (S.D.N.Y. Feb. 7, 2012), Smith Decl, Ex. C; *In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809, at *5 (D.N.J. Jan. 14, 2008), *Fagin v. Merck & Co.*, No. ATL-L-3406-07-MT, slip op. (N.J. Super. Ct. Law Div. Apr. 15, 2010), Smith Decl, Ex. D; *Lambrecht v. Taurel*, No. 1:08-cv-68-WTL-TAB, slip op. (S.D. Ind. July 27, 2010), Smith Decl, Ex. E.

These benefits are especially sufficient to warrant preliminary approval, given the very real possibility that continued litigation would yield no benefit for E*TRADE. The risks of demonstrating liability and proving damages are substantial. As the Courts of the Second Circuit have repeatedly recognized, "stockholder litigation is notably difficult and notoriously uncertain." *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973); *see Schimmel*, 57 F.R.D. at 487; *Beasley*, 73 F.R.D. at 667. Although Plaintiffs strongly believe their claims are meritorious, the challenges involved even in getting the case to trial are enormous. There is a significant risk that the Amended Complaint might not have withstood challenge at the pleading stage, especially given the heightened particularity standards of Federal Rule of Civil Procedure 9(b) (pleadings sounding in fraud) and Rule 23.1 (demand futility), and the difficulty of pleading scienter under the heightened standards of the Private Securities Litigation Reform Act of 1995.

Even if Plaintiffs were to prevail at the pleading stage, success in establishing Defendants' liability is by no means a foregone conclusion. Document discovery would need to be completed. Many depositions would need to be taken. Experts would need to be prepared and expert discovery conducted. Continued litigation would involve substantial risks at every turn, including defeating Defendants' anticipated motions for summary judgment and motions in limine, obtaining a favorable judgment at trial, and maintaining that judgment through post-trial appeals. As one court has observed, "the odds of winning [a] derivative lawsuit [are] extremely small[.]" *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

The challenges involved in determining and proving the amount of recoverable damages are equally daunting. "The determination of damages ... is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable." *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at

*21 (S.D.N.Y. Nov. 26, 2002).  In fact, Plaintiffs face substantial risks in even attempting to present expert testimony on damages, as Defendants undoubtedly would have challenged such testimony as speculative and unreliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 585 (1993).

Even if Plaintiffs were to establish damages, the Individual Defendants would certainly seek indemnification from the Company, presenting additional serious risks to any effort to obtain a better recovery than that guaranteed by the Settlement.

The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery for E*TRADE after years of additional litigation, while ensuring that the Company and its shareholders obtain immediate benefits through the valuable Corporate Governance Reforms, and is therefore eminently reasonable.

### 3.      Continued Litigation Would Be Complex, Time-Consuming and Expensive

A preliminary evaluation of the fairness of a settlement requires a court to balance the "'likely rewards of litigation' with its 'risk and cost'" against the benefits obtained by settlement. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *see W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 741 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971); *Bell Atl.*, 2 F.3d at 1311.  The complexity, expense and likely duration of continued litigation weigh heavily in favor of settlement, here.  *See Grinnell*, 495 F.2d at 463.  Unless the proposed settlement is clearly inadequate, its approval is preferable to continuing lengthy and expensive litigation with highly uncertain results.  *See In re Metro. Life Derivative Litig.*, 935 F.Supp. 286, 294 (S.D.N.Y. 1996) (settlement best serves all parties' interests "[i]n view of the effort and expense that would have been required to take this case to and through trial").  As noted, the case involves twelve individual defendants and dozens of non-

party witnesses who would have to be deposed; a monumental documentary record the Parties would have to prepare for presentation at trial; and myriad complex issues of law and fact the Parties would need to master in trying the case and pursuing it through appeal – all without any guarantee of materially improving on the Settlement's recovery.  The Settlement obviates the expenditure of further time and resources, and resolves the litigation on favorable terms for E*TRADE, permitting the Company to return its attention to generating value for its shareholders.  *See AOL Time Warner*, 2006 WL 2572114, at *5.  These considerations weigh heavily in favor of preliminary approval.

### 4. Sufficient Information Has Been Adduced at this Stage of the Proceedings to Warrant Preliminary Approval

Plaintiffs Counsel's rigorous investigation preceding the filing of their 142-page Amended Complaint combined with their diligent and thorough evaluation of materials drawn from the 12 million pages of document and written discovery generated in the factually related Securities Class Action is more than sufficient to support counsel's recommendation that the Settlement is in the best interests of E*TRADE.  *See D'Amato*, 236 F.3d at 87 ("[T]he district court properly recognized that, although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information.  Thus, the 'stage of proceedings' factor also weighed in favor of settlement approval."); *see In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 140, 125 (S.D.N.Y. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the fact of the underlying litigation") (citation omitted).

## V. THE PROPOSED NOTICE OF SETTLEMENT IS ADEQUATE

Under Federal Rule of Civil Procedure 23.1, notice of a proposed settlement of a shareholder derivative action "shall be given to shareholders in such manner as the court directs."

The Stipulation and proposed Preliminary Approval Order contemplate that, within ten calendar days after the entry of the Preliminary Approval Order, (i) E*TRADE shall publish the Summary Notice once in *Investor's Business Daily*; (ii) E*TRADE shall file the Notice on Form 8-K with the SEC; and (iii) Robbins Umeda LLP and E*TRADE shall post copies of the Notice and the Stipulation on their respective websites.  Stipulation, ¶¶3.3-3.4.

The Parties believe that this comprehensive method of notice to shareholders is reasonable and satisfies both Federal Rule of Civil Procedure 23.1 and constitutional due process standards.[7]  The Notice is drafted in plain and easily understood language, clearly describes the nature of the Action and the claims alleged in the Action, the terms of the proposed Settlement, including the maximum amount of attorneys' fees and unreimbursed expenses that Plaintiffs' Counsel may petition the Court for, and the reasons for the Settlement.  *See* Stipulation, Ex. D. In addition, the Notice invites E*TRADE shareholders who seek additional information to inspect the Stipulation and other documents filed with the Court.  *Id.*  As a result, the Notice more than reasonably "calculated to apprise the parties of the terms of a proposed settlement and the options available in connection with the judicial proceeding."  *In re Drexel Burnham Lambert Group*, 995 F.2d 1138, 1144 (2d Cir. 1993).  The Court should therefore approve the proposed method and form of notice to E*TRADE shareholders.

---

[7] The use of publication and website posting notice in shareholder derivative actions has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system.  The notice program employed in this case has been approved by many courts.  *See, e.g., Forest Labs., Inc. Deriv. Litig.*, Lead Civil Action No. 05-CV-3489, slip op., ¶7, Smith Decl., Ex. C; *In re the Cheesecake Factory Inc. Derivative Litig.*, No. CV-06-6234 ABC(MANx), slip op., ¶2 (C.D. Cal. Apr. 14, 2008) (finding publication of the notice in *Investor's Business Daily* meets the requirements of Federal Rule of Civil Procedure 23.1 and due process), Smith Decl., Ex. F; *Alaska Elec. Pension Fund v. Sperling*, No. CV-06-2124-PHX-ROS, slip op., ¶7 (D. Ariz. Apr. 18, 2008) (finding publication of notice in *Investor's Business Daily* and posting on company's website meets the requirements of Federal Rule of Civil Procedure 23.1 and due process), Smith Decl., Ex. G.

## VI.   PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, the Parties request that the Court establish dates by which the Notice of Settlement will be provided and by which E*TRADE shareholders may object to the Settlement and the Fee Application.  The Parties also request that the Court set the date for a hearing on the final approval of the Settlement and Fee and Expense Application (the "Settlement Hearing").  The proposed schedule is extended to include the Parties' briefing on the Fee and Expense Application, which will be heard at the Settlement Hearing.  The following schedule is proposed:

| | |
|---|---|
| Publication of the Summary Notice in *Investor's Business Daily* ("Notice Date") | No later than 10 calendar days after entry of the Preliminary Approval Order |
| Filing of the Notice with the SEC via a Form 8-K | No later than 10 calendar days after entry of the Preliminary Approval Order |
| Posting of the Notice and Stipulation on the websites of Robbins Umeda LLP and E*TRADE | No later than 10 calendar days after entry of the Preliminary Approval Order |
| Plaintiffs shall file and serve their Fee and Expense Application | No later than 30 calendar days following entry of the Preliminary Approval Order |
| Defendants shall file and serve their opposition papers, if any, to the Fee and Expense Application | No later than 30 calendar days after the filing of the Fee and Expense Application |
| Plaintiffs shall file and serve their reply, if any, in further support of their Fee and Expense Application | No later than 20 calendar days after the filing of Defendants' opposition papers to the Fee and Expense Application |
| Date by which Current E*TRADE Shareholders must serve and file objections to the Settlement | No later than 14 calendar days prior to the Settlement Hearing |
| Date by which to file papers in support of Settlement and in response to any objections | No later than 7 business days prior to the Settlement Hearing |

| Settlement Hearing | At least 90 days after the entry of the Preliminary Approval Order |

This schedule satisfies any due process interests E*TRADE shareholders may have with respect to the Settlement.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) preliminarily approve the terms of the Settlement as set forth in the Stipulation and enter the proposed Preliminary Approval Order; (ii) approve the form and manner of disseminating Notice of the Settlement to E*TRADE shareholders; and (iii) schedule the Settlement Hearing to consider the final approval of the Settlement and Plaintiffs' Counsels' Fee and Expense Application.

DATED:  November 2, 2012                Respectfully submitted,

LAW OFFICES OF THOMAS G. AMON


_____
/s/Thomas G. Amon
THOMAS G. AMON (TGA 1515)

250 West 57th Street, Suite 1316
New York, N.Y. 10107-1324
Telephone: (212) 810-2430
Facsimile:  (212) 810-2427

ROBBINS UMEDA LLP
CRAIG W. SMITH
JULIA M. WILLIAMS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Co-Lead Counsel for Plaintiffs

FARUQI & FARUQI, LLP
BETH A. KELLER
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile:  (212) 983-9331

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
ALBERT Y. CHANG
110 West A Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0271
Facsimile:  (619) 255-1856

Additional Counsel for Plaintiffs

732586

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 2, 2012, a copy of the foregoing was filed electronically using the Court's CM/ECF system.  Notice of this filing will be sent to all parties on the attached service list by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Thomas G. Amon
THOMAS G. AMON (TGA 1515)

# Mailing Information for a Case 1:07-cv-08612-JPO

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas G. Amon**
  tamon@amonlaw.com

- **Jeffrey Paul Fink**
  notice@robbinsumeda.com,mumeda@robbinsumeda.com

- **Dennis E. Glazer**
  dennis.glazer@dpw.com,ecf.ct.papers@dpw.com

- **Mark A. Golovach**
  mgolovach@robbinsumeda.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Beth Ann Keller**
  bkeller@faruqilaw.com

- **Nancy B. Ludmerer**
  nancy.ludmerer@dpw.com,ecf.ct.papers@dpw.com

- **Craig W. Smith**
  notice@robbinsumeda.com,athompson@robbinsumeda.com

- **Amelia Temple Redwood Starr**
  amelia.starr@dpw.com,ecf.ct.papers@dpw.com

- **Marc M. Umeda**
  notice@robbinsumeda.com,gaguilar@robbinsumeda.com,jrazzouk@robbinsumeda.com

- **Julia Marie Williams**
  jwilliams@robbinsumeda.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`